UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Jarred T. Molesky, et al.,                              Case No. 3:12 cv 2639

           Plaintiffs

     v.                                                      MEMORANDUM OPINION


State Collection & Recovery Services, LLC, et al.,

           Defendants


## I.    BRIEF BACKGROUND

In September 2008, Jarred T. Molesky, and Jeffrey and Paula Hornyak initiated this litigation in Erie County Common Pleas Court as a putative class action.   The history of related litigation was set forth in a previous opinion (Doc. No. 36) and need not be repeated here.  Suffice it to say, that following removal of the litigation and motion practice, the remaining parties to this litigation are  Molesky and the Hornyaks, with State Collection & Recovery Services, LLC as the sole remaining Defendant.

The amended complaint alleges violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA"), violations of the Ohio Consumer Practices Act, O.R.C. § 134 et seq. and for breach of public policy for abusive, deceptive, and unfair practices in debt collection activities.  The Plaintiffs' claims relate to State Collection's conduct occurring in 2008.

This matter is before me on the Defendant State Collection & Recovery Services, LLC's motion for summary judgment (Doc. No. 47) , Plaintiffs' opposition (Doc. No. 50) and Defendant's reply (Doc. No. 53).  For the reasons stated below, the Defendant's motion is granted in part and denied in part.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor.  *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014).  A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law.  *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

## III. THE FAIR DEBT COLLECTION PRACTICES ACT

In response to the abusive and deceptive practices by debt collectors, Congress enacted the FDCPA as follows:

> It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.

15 U.S.C. § 1692(e).

At its heart, the FDCPA addresses issues such as [the debt collector's] communications with the consumer, specific types of harassment prohibited, false or misleading representations, unfair practices, validation of debts, as well as enforcement mechanisms.  As a remedial statute, it is liberally interpreted as its reach is "extraordinarily broad."  *Currier v. First Resolution Inv. Corp.*, 762 F.3d 529, 533 (6th Cir. 2014).   As a strict liability statute, the imposition of liability does not require scienter.  *Stratton v. Portfolio Recovery Associates, LLC*, 770 F.3d 443, 448 (6th Cir. 2014).

2

Civil liability is imposed upon "any debt collector who fails to comply with any provision of this subchapter."  15 U.S.C. § 1692k(a).  As noted by the Supreme Court in *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 578 (2010), there are two exceptions to the imposition of liability pursuant to § 1692k:

> (c) Intent
>
> A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.
>
> [or]
>
> (e) Advisory opinions of Bureau
>
> No provision of this section imposing any liability shall apply to any act done or omitted in good faith in conformity with any advisory opinion of the Bureau, notwithstanding that after such act or omission has occurred, such opinion is amended, rescinded, or determined by judicial or other authority to be invalid for any reason.

Violations under the FDCPA are viewed through the lens of the "least sophisticated consumer" as "[t]his standard recognizes that the FDCPA protects the gullible and the shrewd alike while simultaneously presuming a basic level of reasonableness and understanding on the part of the debtor, thus preventing liability for bizarre or idiosyncratic interpretations of debt collection notices."  *Currier*, 762 F.3d at 533.  (Citations omitted).

With that framework in mind, I now turn to the specific violations asserted by the Plaintiffs.

**A. 15 U.S.C. § 1692g—Validation of Debts**

The statute requires the following regarding the notice of debt and its contents:

> Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information in the initial

communication or the consumer has paid the debt, send the
consumer a written notice containing--

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt
of the notice, disputes the validity of the debt, or any portion thereof,
the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing
within the thirty-day period that the debt, or any portion thereof, is
disputed, the debt collector will obtain verification of the debt or a
copy of a judgment against the consumer and a copy of such
verification or judgment will be mailed to the consumer by the debt
collector; and

(5) a statement that, upon the consumer's request within the thirty-day
period, the debt collector will provide the consumer with the name
and address of the original creditor, if different from the current
creditor.

15 U.S.C. § 1692(g)(a).   Plaintiffs allege violation of this statute contending the Defendant failed to

comply with sending mandatory validation notices to Jarred Molesky and Jeffrey Hornyak.

### 1.    Jarred Molesky—Validation Notice

According to the Amended Complaint, Molesky received a collection letter dated August 15,

2008, characterized as a "last chance" letter.  (Doc. No. 1-1, pp. 11 and 19)  Molesky contends he

did not receive a bill from a creditor or a medical provider prior to the August 15, 2008 collection

letter.

There is no dispute that Molesky had two debts relative to this dispute; the first, with North

Central EMS, and the second with Norwalk Emergency Services.   According to the Defendant's

manager, Diane Metarko, State Collection relies on the information received from their client before

pursuing collection of the account.  (Metarko Dep., p. 126).

In August 2008, State Collection received two files for Mr. Molesky.  According to the

records of State Collection, they received two files for each of these debts and sent out separate

validation notices as they received each file for Mr. Molesky. The first validation notice, relating to

the North Central EMS debt, was sent to Mr. Molesky on August 4, 2008.  The second validation notice, regarding the Norwalk Emergency Services debt, was sent on August 12, 2008.  Those validation notices were sent to the wrong city based upon an erroneous address listed in the electronic file sent by the client.

On the same day the validation notice went out on the Norwalk Emergency Services account, the Defendant received by return mail, the undelivered validation notice on the North Central EMS account.  State Collection erroneously noted the returned mail in the Norwalk Emergency Services account and not the North Central EMS account.  This resulted in the Defendant's records showing that there was no returned mail for the North Central EMS account and the Defendant presumed the validation notice from North Central EMS had been delivered.  Likewise, Defendant's notes in the North Central file do not show an updated address for Mr. Molesky.

Although Molesky's address was updated on the Norwalk Emergency Services account, validation notices were not regenerated for either account.  According to the Defendant's policy, the collector should have resent the notice once the address was corrected, but did not.  (*Id.* at p. 140).  Instead, the "last chance" notice, dated August 15, 2008, was sent to Molesky.

Having received the "last chance notice," on August 20, 2008, Molesky called State Collections regarding the absence of a bill from the medical providers or an initial notice from the Defendant.  (*Id.* at p. 138).  Defendant's collector placed that information on the Norwalk account and an additional account that had been closed in 2000.  No information was updated on the North Central account.

After Molesky's phone call to State Collection, the Defendant ceased all collection activity.  On August 25, 2008, the Defendant received a cease and desist letter from Molesky.  The state court complaint was filed less than a month later.

5

The Defendant seeks summary judgment on Molesky's validation notice claims based upon the bona fide error defense. In support of its motion, the Defendant argues Molesky is presumed to have received the validation notice on the Norwalk account as there is no evidence it was returned to the Defendant. Secondly, Defendant asserts its inadvertence in failing to resend the validation notice in the North Central account and instead sending him a "last chance" letter is a good faith clerical error and qualifies as a bona fide error.

To be entitled to a bona fide error defense, the Sixth Circuit holds the "debt collector must prove by a preponderance of the evidence that the violation was unintentional, that it was the result of a bona fide error, and that the debt collector maintained procedures to avoid the error." *Currier*, 762 F.3d at 537, citing *Hartman v. Great Seneca Financial Corp.*, 569 F.3d at 614. "[T]he maintenance of procedures reasonably adapted to avoid any error" implies an objective standard, whose elements are necessarily fact-dependent. *See e.g. Rush v. Portfolio Recovery Assoc.*, 977 F.Supp.2d 414, 427 (D.N.J. 2014); quoting *Johnson v. Riddle*, 443 F.3d 723, 729 (10th Cir. 2006).

The elements and burdens relative to this defense have been described as follows:

> The first element is a subjective inquiry into the "credibility of the debt collector's assertions that the FDCPA violation was not intentional" and the second and third elements are judged under an objective standard. *Id.* The defense "does not require debt collectors to take every conceivable precaution to avoid errors, it only requires reasonable precaution."

*McDonald v. Asset Acceptance LLC*, 296 F.R.D. 513, 526 (E.D. Mich. 2013), quoting *Charbonneau v. Asset Acceptance LLC*, 611 F.Supp.2d 736, 743 (E.D. Mich. 2009). *See also Durthaler v. Accounts Receivable Management, Inc.*, 854 F.Supp.2d 485, 493-95 (S.D. Ohio 2012).

Looking at the second and third elements, "whether the debt collector 'maintained'—i.e., actually employed or implemented—procedures to avoid errors; and second, whether the procedures were 'reasonably adapted' to avoid the specific error at issue," is considered first as both

elements are judged under the objective standard and determinative of the analysis on this defense. *Id.* at 495, *citing Riddle*, 443 F.3d at 729.  Specifically, "[w]here defendants maintain extensive systems designed to prevent errors, an unintentional violation of the [FDCPA] will not result in liability." *Jenkins v. Heintz*, 124 F.3d 824, 834 (6th Cir. 1997), *cert. denied* 523 U.S. 1022 (1998) (citation omitted).

According to Defendant's manager, the files are electronically imported from the client. Defendant's system automatically generates an initial validation letter using the information from the client file which includes identification of the creditor, the debtor's name, address, and amount of the debt.  Thirty days after the validation letter is sent, the file is assigned to a collector, each of whom is assigned a specific letter of the alphabet.

At her deposition, Defendant's manager, Ms. Metarko, testified on the training for the collectors employed:

Q:     Do you have a bound training manual?

A:     Bound, no; a loose paper training manual.

Q:     How is it stored? Is it in a binder?

A:     It's in a manila envelope.

Q:     How many pages approximately would it be?

A:     Well, it varies because we add to it, such as these things, we add to it periodically, so it varies.  It's always been quite thick though.  We put the Fair Debt Collection Practices Act in there, the letters, the information packets.  We have what we call a One Step Card, which I have broken out to what they need to do with an account from start to finish, which is basic, but then you have every scenario that a debtor comes, different stories, different scenarios that—but it's basic. You get the account in, you send a first notice, it goes in the collector's queue, they receive the account 30 days after the first notice goes out, and then they start working with the account with phone calls and letters and phone calls and letters, skip tracing.  It just depends on what category that falls in; if they have to skip trace, and it's been a bad address or whatnot.

(Doc. No. 41-1, pp. 40-41).

Metarko also explained the hands-on training received by new collectors:

A:     Thank you. This training manual is not all that the collectors get, this is paper that they get to go through and they have to read and everything, but they are

actually trained. They don't get on the phone and do collections from this manual. They are actually trained by individuals.

Q:      Okay.  And how are they trained?

A:      My more senior collectors -- is that a word, more senior, the two oldest collectors that I have normally train. And also I intervene occasionally, walking through, I stop and ask, is there anything that they are not understanding, you know, and go over some things, like bring to my attention. And occasionally, again, I stop in, but the collector sits with them.

Q:      The new collector?

A:      The older collector sits with the new collector, yes, and they do the training.

Q:      Is there any document?

A:      Hands on. I'm sorry.

Q:      Is there any document that goes along with that training?

A:      The new collector just takes notes on everything, and then the collector stays with them as long as it takes for them to understand the Fair Debt Practices Act and how we handle the system and what needs to be done in order that it needs to be done.

Q:      And is there any other specific documents that goes along with that process?

A:      No.

Q:      How long does the training period last?

A:      Oh, it lasts as long as it needs to.

(*Id.* at pp. 172-73).

In addressing the error in sending Mr. Molesky the "last chance" letter when State Collection had received returned mail to an incorrect address, Metarko addressed the issue in the following way:

Q:      All right.  Handing you what's been marked as Exhibit 15. [Last chance letter.]  This is the first communication in writing with Jarred Molesky received from State Collection & Recovery Services.  Is that your understanding?

A:      That is what I am understanding.

Q:      Did you get that understanding from the account notes?

A:      The account notes and the collector.

Q:      Who is the collector?

A:      That was Lutresa Patton.

8

Q:      And her pseudonym is Beth Connor?

A:      Yes.

Q:      And what did Lutresa tell you?

A:      She doesn't know how that happened, that's    basically what she said, she'
not sure. In looking at the account, what I could determine happened, there was two
accounts -- there was, there's actually three accounts on him, one that was a very old
account, that was either paid or adjusted off or I'm not sure of the circumstances.
But when an account comes into the system, there's two criterias that accounts get
grouped together in the system. And the criteria is name and Social Security. They
have to be exact. So if there's a middle initial on one and not on the other, it won't
get grouped together. So the determination is it looks and appears to be that these
accounts were not grouped together in the systems, so they were not being worked
together as one individual at the time the validation letters went out to this
individual. There was mail returned, it appears that there was mail returned on the
notes and once she determined -- there was a phone call that came in, and I'm trying
to recall the conversation, this might not be totally accurate, but Mr. Molesky called
in on a letter, I believe it was a letter, perhaps it was this letter, he had called in on it
and said he had never received a letter as a first -- the validation letter, never received
the validation letter, and asked for a list of the accounts. At the point that he called in
the account was grouped together.

Q:      With what other account?

A:      With North Central EMS and Norwalk Emergency Services. Those are the
two open accounts that he had in collection. They were separated in the system, so
they were being worked individually.

Q:      By two different --

A:      By the same -- by the same collector.

Q:      And that's because you work by initials, so she has the whole letter M?

A:      That's correct. And didn't realize that there was two individuals because you
have a multitude of accounts and they come in at different times, and different times
different things are worked on differently, different scenarios. So from what I could
determine, without looking at the notes, is that when the call came in, she notated, I
believe, on the wrong account that he was actually calling in on, I believe, or the

account, the letter that went out earlier. So somehow the confusion came in that they were notated improperly. So the notes of the accounts that he called in on for the first letter went onto the actual letter that came in later on, that letter, because they were just a matter of days, I believe, that the accounts came into the system. She got the change of address. The accounts were then grouped together. Once she sent the letter out, she sent the letter out, this urgent reply out on the account that she dated the address on -- or I'm sorry, did not update the address on. She updated the address on the first account. That was our No. 1 account, and didn't update this, and that's when she posted that, this to that account from what I can gather. It's our best guess that that's kind of what happened in there. She did change the address and she did not send the validation out on the accounts.

Q:    Was there any system in place to catch the fact that there was a change of address and no validation letter that was sent out?

A:    Only per the notes.  There's no way of catching that on our end.

Q:    So there's no double check, there's no procedure that says, change of address, it automatically spits out a new validation letter for that individual?

A:    No, ma'am.  The collector has to put the letter on.

Q:    And is there any quality check on that person; is there any sort of review?

A:    Periodically, yes, because they are trained to do that.  They know that a first notice has to go out on anyone in the system.  That is the first letter that goes out. So if there's a change of address, and basically not a change of address, if there's a change of address, we have address corrections requested on our letters, so we get the change of address, but the letter is actually forwarded to them. On this particular account, we didn't get a change of address, we got a mail return and it was due to the city, I believe. The address was correct other than the city and state. The state was correct. It was actually just the city. Collins and Norwalk, which are side-by-side, and that is something that the client picked up. Now that's what the client sent us was Norwalk, and it was to be Collins. So when the account went back to the collector, the collector did the skip tracing process through LexisNexis and found out that it was Collins, updated the address and sent this out. She did not catch the fact that the first notice had not gone out.

. . . .

10

A: . . . It appears to be that she did not catch that the validation letter did not go out on the account, it shows that it was printed in the system when it showed printed. She was a new collector and, you know, that is really not an excuse though.

Q:     So she looked at the notes and the notes said that a validation letter had gone out at some point, correct?

A:     Yes.

Q:     So she looked at the notes and the notes said that a validation letter had gone out at some point, correct?

A:     Yes.

Q:     And she saw that and said, okay, check, validation letter had gone out, correct?

A:     Right.

Q:     She then gets information of a change of address, changes the address, correct?

A:     We got mail returned.

Q:     Got mail returned and then she changes the address in the system?

A:     Correct. She does the skip tracing process.

Q:     Does she send the letter out that came back on the mail return? Did she resend that letter to the new address?

A:     So she did not because they were in the validation letters. She --

Q:     She got the validation letter back and then sends out this next letter?

A:     That's correct.

Q:     Okay.  And was the first time you were aware that that happened after the lawsuit was filed?

A:     First time, yes, ever.

(*Id.* at pp.  135-42).

A review of the Defendant's policies regarding "Collectors Duties" places an emphasis on the validation letter:

> The first step to collect an account is the debtor get a 1st notice giving the notification that they have been turned over to collection.  The mini Miranda is on the bottom of the letter along with the words this is an attempt to collect a debt

from a debt collector and any information obtain[sic] will be used for that purpose. After 30 days the account goes to the collector and the collection procedure begin[sic].

(*Id.* at p. 350). Returned mail is addressed under skiptracing:

SKIPTRACING: This is when an account has had Mail Return on it or we can not contact the Debtor. Call same name, Call neighbor; Check the Internet for programs that helps locate Debtors, Metrosearch, Accurint, and the Internet is used. If can find some one that knows our Debtors, Message are left for a return call with a phone ff and a desk name. NO COMPANY NAME IS LEFT. NO INDICATION OF A DEBT! All contacts are knotted.

(*Id.* at p. 351). A document titled "Collection Process and Legal referral" indicates the agency process prior to referral of the account to a lawyer:

Agency Process
1st notice
Check phone information
Check information on all accounts if multiple accounts grouped together
Call all phone numbers at least twice
Send Letters ( minimum of 2) (Final Letter-Urgent)
Call auditors/landlords
Same names/numbers check
Credit check
Verify assets
Sent for authorization from client
Check Probate
Refer to attorney

(*Id.* at p. 354).

In Molesky's situation, his accounts were combined only after he called in to complain he had not received an initial letter before the "last chance" letter. I find the record before me supports the proposition that Defendant utilized procedures to avoid errors to stay in compliance with the dictates of the FDCPA. The second inquiry, whether those procedures were "reasonably adapted to avoid the specific error at issue," presents a greater challenge.

The Supreme Court in *Jermaine* addressed the meaning of the phrase "procedures reasonably adapted to avoid any such error" to mean "the statutory phrase is more naturally read to apply to processes that have mechanical or other 'regular orderly' steps to avoid mistakes—for instance, the

kind of internal controls a debt collector might adopt to ensure its employees to do not communicate with consumers at the wrong time of the day."  559 U.S. at 587.

Unlike the Defendant in *Durthaler*, the Defendant here has not shown specific procedures reasonably adapted to avoid this type of error.  None of the checklists address the situation where the initial validation notice is returned by mail and, upon determining the original address was incorrect, directs the collector to resend the initial notice.   According to Metarko's testimony, there was not a procedure in place which prompted the collector to resend the validation notice to the correct address absent looking at the account notes.  Had this been a situation where there was a procedure to double check that a validation notice was issued once an address was corrected, a singular instance of a mistake would constitute a bona fide defense as a matter of law.  Instead, the absence of a procedure to prevent such a misstep coupled with Metarko's deposition testimony, raises issues of fact as to whether the specific procedures utilized by Defendant were reasonably adapted to avoid liability under the FDCPA.  854 F.Supp.2d at 494-95.  *See also Currier v. First Resolution Inv. Corp.*, 762 F.3d at 537-38 (Creditor not entitled to the bona fide error defense where it alleged nothing to show it maintained a procedure to avoid the error in question); *Allen v. Checkredi of Kentucky, LLC*, 2010 WL 4791947 *14 (E.D. Ky. 2010) (defendant's procedures were not structured and had no quality assurance system in place to catch errors).

Therefore, assuming the Defendant's conduct was not intentional and it had procedures in place which complied with the FDCPA, and based upon the record before the Court, reasonable minds could differ on whether those procedures were "reasonably adapted to avoid any such error." *See e.g., Edwards v. McCormick*, 136 F.Supp.2d 795, 801-02 (S.D. Ohio 2001) (the "error-catching" procedure was not consistently performed which negated the burden on the third prong of the bona fide error defense).  Defendant's motion for summary judgment on Molesky's Section 1692g validation claim is denied regarding the North Central EMS account.

13

An initial validation notice was also issued on the Norwalk Emergency Services account but the Defendant's records do not show that notice was returned.   Plaintiffs do not dispute this fact. As there is authority to support the presumption of delivery in the absence of returned mail, *Newton v. Portfolio Recovery Asssoc., LLC*, 2014 WL 340414 at *11 (S.D. Ohio 2014), Defendant is granted summary judgment on this branch of their motion.

### 2.  Jeffrey Hornyak-Validation Notice

It is undisputed that the Defendants mailed three collection letters to Paula Hornyak in February 2008, relating to three separate debts.  In April 2008, a second collection letter, demanding payment for all three debts, was addressed and mailed to Ms. Hornyak.   Subsequently, in August 2008, the Defendants sent a collection letter to both Paula and Jeffrey Hornyak for collection of that outstanding debt.   Plaintiffs contend the August 2008 correspondence to Mr. Hornyak violated § 1692g as he never received a validation notice required by statute before receiving this "last chance" letter from State Collection.

The Defendant disputes liability, noting it sent three separate validation notices to Paula Hornyak in February 2008. A follow-up letter by the Defendant on the cumulative debt, dated April 1, 2008, was sent to Ms. Hornyak.  Paula Hornyak returned the correspondence with a note written on the letter, indicating she would only be able to pay $10.00 per month and attached a check for the same amount, written on a joint checking account with her husband, Jeffrey Hornyak.   Ms. Hornyak failed to follow through with subsequent monthly payments on this debt.   On July 23, 2008, Ms. Hornyak called State Collection indicating she wished to resume making monthly payments on her debt.  The Defendant advised her they would accept half of the debt that month with the remainder due the following month.

The next communication Defendant mailed was a "last chance" letter, dated August 5, 2008, and was addressed to both Paula and Jeffrey Hornyak. It is this August 2008 communication which Jeffrey Hornyak contends violated the validation requirement under the FDCPA.

All parties agree the debts were incurred by Paula Hornyak. There is also no dispute that the relevant validation letters mailed to Paula Hornyak in February 2008 were not challenged by her. Under the statute, the language regarding notice of a debt is aimed at the "initial communication with a consumer in connection with the collection of any debt." § 1692g(a). The statute also defines a consumer to "include[] the consumer's spouse." § 1692c(d).

The record shows the Defendant was aware Ms. Hornyak was likely married as her partial payment after March 2008 was written on a joint checking account with her husband, Jeffrey. It was only after Ms. Hornyak contacted Defendant in July 2008, advising of her inability to pay per the schedule requested by State Collection, that the Defendant investigated whether Jeffrey was employed, finding he was gainfully employed. Each communication by the Defendant was mailed to the same address. Jeffrey Hornyak was not named on the correspondence until after that investigation by the Defendant on his employment status.

The statute does not require the debt collector to send a separate validation notice to the consumer/spouse where the initial validation notice was received by the debtor and not disputed. While neither counsel nor the Court has located a decision speaking directly to this issue, there is authority to support the proposition that follow-up correspondence to an initial validation does not violate § 1692g. For example, the Third Circuit addressed alleged § 1692g violations in follow-up correspondence and after defining the meaning of the term "initial," made the following observations:

> We agree with the common-sense conclusion reached by other courts that "there can be only *one* 'initial communication' between a debt collector and a consumer, and any communication that follows the 'initial communication' is necessarily not an 'initial' communication." *Derisme v. Hunt Leibert Jacobson, PC*, 2010 WL 4683916, at *5 (D.

Conn. Nov. 10, 2010). Faced with cases in which a validation notice did accompany an initial communication, but the plaintiff argued that the FDCPA was violated by subsequent communications lacking such a notice, courts have concluded that a debt collector has no obligation to send a validation notice with any communication other than the initial communication. *Weber v. Computer Credit, Inc.*, 259 F.R.D. 33, 39 (E.D.N.Y. 2009); *Spira v. Ashwood Fin., Inc.*, 358 F.Supp.2d 150, 158-59 (E.D.N.Y. 2005); *see also Ehrich v. RJM Acquisitions LLC*, 2009 WL 4545179, at *2 (E.D.N.Y. Dec. 4, 2009) ("Any letters after [the first communication between a debt collector and a consumer] are irrelevant for purposes of the notice requirement in Section 1692g(a).").

*Peterson v. Portfolio*, 430 Fed. Appx. 112, 114-15 (3rd Cir. 2011). *See also*, *McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, 911 F.Supp.2d 1, 56 (D.Mass. 2012); *Dorsey v. David B. Schumacher, P.C.*, 2015 WL 569958, at *3 (D. Or. 2015) ("[O]nly a debt collector's '*initial* communication' with a debtor is subject to the notice requirement" under § 1692g(a)) (emphasis added); and *Taylor v. Ocwen Loan Servicing, LLC*, 2013 WL 3353955, at *4 (S.D. Tx. 2013).

Plaintiffs' arguments on the Defendant's failure to send a validation notice separately to Jeffrey Hornyak are not persuasive. The statute requires notification to the consumer and in this case it is undisputed that Paula Hornyak received three validation letters to the same address as that of her husband. Moreover, the salutation on the August 2008 follow-up correspondence stated, "Dear PAULA & JEFFREY HORNYAK,". (Doc. No. 41-1, p. 498).

The Plaintiffs' arguments critical of Defendant's adding Jeffrey Hornyak, without first determining whether he was responsible for his wife's medical bills, are also without merit. The undisputed record demonstrates the Defendant undertook an investigation of his employment situation once they became aware he was her spouse and lived at the same address. Accordingly, Defendant is entitled to summary judgment on the claim challenging the lack of a validation notice being sent to Jeffrey Hornyak.

**B. 15 U.S.C. § 1692e False or Misleading Representations**

The FDCPA prohibits false or misleading representations as follows:

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.  Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The false representation or implication that the debt collector is vouched for, bonded by, or affiliated with the United States or any State, including the use of any badge, uniform, or facsimile thereof.

(2) The false representation of –

(A) the character, amount, or legal status of any debt; or

(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

. . . .

(9)  The use or distribution of any written communication which simulates or falsely represented to be a document authorized, issued or approved by any court, official, or agency of the United States or any State, or which creates a false impression as to its source, authorization, or approval.

15 U.S.C. § 1692e.

The creditor's conduct and the debtor's understanding of the action is measured under the

least sophisticated consumer standard.  The Sixth Circuit has spoken decisively on this issue:

> "The least sophisticated debtor standard is lower than simply examining whether particular language would deceive or mislead a reasonable debtor." *Computer Credit*, 167 F.3d at 1054 (internal punctuation and citation omitted).  "The basic purpose of the least-sophisticated-consumer standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd." *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993).  "[A]lthough this standard protects naïve consumers, it also 'prevents liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care.'" *Wilson v. Quadramed Corp.*, 225 F.3d 350, 345-55 (3rd Cir. 2000) (quoting *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 136 (4th Cir. 1996)).  Moreover, this standard "assumes that a Validation Notice is read in its entirety, carefully and with some elementary level of understanding." *Martinez v. Law Offices of David J. Stern, P.A. (In re Martinez)*, 226 B.R. 523, 532 (Bankr. S.D. Fla. 2001).

*Federal Home Loan Mortgage Corp. v. Lamar*, 503 F.3d 504, 509-10 (6th Cir. 2007).

The Sixth Circuit also acknowledges a claim of misrepresentation may be appropriate for a summary

judgment ruling.  *Buchanan v. Northland Group, Inc.*, 776 F.3d 393, 397 (6th Cir. 2015), *citing Lamar*, 503

F.3d at 508 n.2 ("We have determined that . . . 'courts may properly make the objective

determination whether language effectively conveys a notice of rights to the least sophisticated debtor.'") (citations omitted).

Plaintiffs allege violations of § 1692e based on the use of the word "State" in Defendant's name, demand for immediate payment in their validation notices, and the aggregation of multiple accounts. In contrast, the Defendant states it is entitled to summary judgment as a matter of law.

**1. Use of the word "State"**

The Defendant's letterhead lists its name as "State Collection & Recovery Services[1]," and adjacent to the name is the acronym SCRS with a symbol underneath the acronym. The symbol appears to be an upside down arrow. Also listed adjacent to the aforementioned letterhead, to the right, is the address, phone and fax numbers of the Defendant.

Unlike the cases relied upon by Plaintiffs, there is no symbol which infers affiliation with a governmental entity. In *Adams v. First Federal Credit Control, Inc.*, 1992 WL 131121 (N.D. Ohio 1992), Judge Aldrich granted plaintiff summary judgment where the Defendant's letterhead was paired with the "icon of a bird with its wings spread, grasping olive branches in its right talon and arrows in its left talon." *Id.* at *1. In the present action, the symbol, an upside down arrow does not support an affiliation with a governmental entity.

Plaintiff's reliance on *Dorner v. Commercial Trade Bureau of Cal.*, 2008 WL 1704137 (E.D. Ca. 2008), is also unavailing. In *Dorner*, Defendant moved for dismissal under Rule 12(b)(6) and the court found the § 1692e claim viable as the Defendant's name, Commercial Trade Bureau of California, lacked a designation such as agency, company or corporation. In so doing, the district court noted that "evidence may help in making the legal determination [of a false representation or deceptive means], this case would be better resolved in a summary judgment motion than a motion to dismiss." *Id.* at *5. However, the Court in *Dorner* did note cases in which use of the term

---

[1] The Court attaches a copy of Exhibit 1 to the Complaint as an example of the Defendant's letterhead.

"national" or "New Jersey" were deemed not to create an affiliation with a governmental entity. *Id.* (collecting cases).

Viewing the letterhead in the light most favorable to Plaintiffs and from the perspective of the least sophisticated consumer, the term "State Recovery," alone does not rise to a violation of § 1692e. Based upon the letterhead before me, to find the Defendant's name, letterhead, and communications raise affiliations with a governmental entity would result in a "bizarre or idiosyncratic interpretation[] of collection notices." *Stratton*, 770 F.3d at 450 (citations omitted). Accordingly, Defendant is granted summary judgment on Plaintiffs' claim aimed at the use of the word "State " as misleading.

### 2. Overshadowing

A debt collector violates the FDCPA by contradictory messages which overshadow required messages or notices. *Federal Home Loan Mortg. Corp.*, 503 F.3d at 511; *Pierson v. Franklin Collection Service, Inc.*, 965 F.Supp.2d 957, 969 (E.D. Tenn. 2013). Stated differently, the message is contradictory if it is "reasonably susceptible to an inaccurate reading" or "contains language that overshadows or contradicts other language informing a consumer of [their] rights." *Russell v. Equifax A.R.S.*, 74 F.3d 30, 34 (2d Cir. 1996).

Plaintiffs contend a violation of the FDCPA occurs when a validation notice includes a demand for immediate payment and includes the language, "Due Upon Receipt." Using Exhibit 1 as an example, the text of Defendant's validation letter reads as follows:

> This is an attempt to collect a debt by a debt collector. Any information obtained will be used for that purpose.

> Notice is hereby given that the above named creditor has placed your account, in the amount shown above, with our office for collection.

> We are prepared to settle this account without inconvenience to you.

> If you wish to cooperate send payment remit[sic] the bottom portion with your payment and return it to our office.

Sincerely,

State Collection & Recovery Services
Collection Department

Unless you notify this office in 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid.  If you notify this office in writing within 30 days from receiving this notice, this office will obtain verification of the debt or obtain a copy of  judgment and mail you a copy of such judgment or verification.  If you request this office in writing within 30 days after receiving this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.

(Doc. No. 1-1)  At the bottom of the letter is tear-off section which indicates method of payment, the amount due, the file number and the due date, which states "Upon Receipt".

A factually similar situation presented itself in *Powell v. Computer Credit, Inc.*, 975 F.Supp. 1034 (S.D. Ohio 1997).  In that case, the validation notice contained similar language but included the sentence, "[t]he hospital insists on immediate payment or a valid reason for failure to make a payment."  *Id.* at p. 1042.  The thirty-day notice period was placed on the back of that validation letter.  The district court did not deem this to constitute overshadowing because the wording presented two alternatives which were understood even by the least sophisticated consumer.  *Id.* at 1043.  The Sixth Circuit affirmed the decision on all grounds.  1998 WL 773989 (6th Cir. 1998).

While the language in Defendant's validation letters is not as strong as in *Powell,* it also offers a clear alternative to the debtor.   Even the least sophisticated consumer would understand they had a choice to challenge the debt or to cooperate and remit payment.

The same is true for correspondence sent after the initial validation notice.  For example, the Sixth Circuit has held, "A collection agency does not have to stop its collection effort to comply with the Act.  Instead, it must ensure that its efforts do not threaten a consumer's right to dispute the validity of his debt."  *Smith v. Computer Credit, Inc.*, 167 F.3d 1052, 1055 (6th Cir. 1999).

In Molesky's case, once he contacted the Defendant to inquire as to the absence of a validation letter, Defendant ceased all collection efforts and categorized his contact as a dispute to the debts.  In the case of the Hornyak's, Paula Hornyak contacted Defendant and validated the

20

debts before entering into a payment plan.  Therefore, finding no overshadowing under the least sophisticated consumer standard, Defendant is granted summary judgment on this branch of its motion.

### 3.    Aggregation of Multiple Accounts

Plaintiffs also charge that the Defendant's practice of aggregating multiple accounts in follow-up notices is confusing and misleads consumers in violation of the FDPCA.  I disagree.

While § 1692g requires specificity as to the amount of the debt and name of the creditor to whom the debt is owed, nothing in the statute requires the same specificity in follow-up communications related to collection efforts.  As noted by another district court:

> [T]he Act contains at least one provision which requires certain language to be communicated to a debtor in every single communication sent by the debt collector. *See* 15 U.S.C. § 1692e(11) (both the fact that an attempt to collect a debt is being made and that any information so obtained during the collection procedure will be used for that purpose must be stated in every communication from a debt collector to a consumer); *Pipiles v. Credit Bureau of Lockport,* 886 F.2d 22, 26 (2d Cir.1989) (such notification must occur in "all communications"). The fact that the FDCPA *159 has a statutory provision which requires a debt collector to include specified language in every communication sent to a consumer other than the validation notice, demonstrates that it must only be sent once. *See, e.g., Sosa v. Alvarez-Machain,* --- U.S. ---, ---- & n. 9, 124 S.Ct. 2739, 2754 & n. 9, 159 L.Ed.2d 718 (2004) (party's position not accepted where it "runs afoul of the usual rule that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended") (internal quotations and citation omitted); *Smaldone v. Senkowski,* 273 F.3d 133, 137 (2d Cir.2001) (same), *cert. denied,* 535 U.S. 1017, 122 S.Ct. 1606, 152 L.Ed.2d 621 (2002).

*Spira v. Ashwood Financial, Inc.*, 358 F.Supp.2d 150, 158-59 (E.D.N.Y. 2005).

The summarization of debts in a validation notice violated § 1692g where the debts were aggregated as stemming from "various accounts" and failed to identify the creditors on the accounts. *Smith v. Am. Rev. Corp.*, 2005 WL 1162906 *5 (N.D. Ind. 2005).  Unlike the Defendant in *Smith*, it is undisputed State Collection identified the debtor and amount of debt in individual validation letters; therefore, Plaintiffs' reliance on *Smith* is unavailing.  As stated earlier, there is no dispute the Defendants' validation letters substantively complied with the dictates of § 1692g.  In the absence of

statutory authority requiring itemization of accounts on follow-up correspondence, Plaintiff's charge of confusion in aggregating various accounts in follow-up correspondence is without merit here.

### IV. OHIO CONSUMER SALES PRACTICES ACT

The Ohio Consumer Sales Practices Act, first adopted by the state in 1980, provides for a wide set of protections for consumers.  Ohio Rev. Code Ann. § 1345.01 *et seq.*  The act regulates suppliers in all sorts of consumer transactions, but has been widely held to include debt collection because of the language indicating it regulates violations that occur "before, during, *or after the transaction.*"  § 1345.02 (emphasis added).  The Sixth Circuit also recognizes that a violation of the FDCPA supports a violation of the OCSPA.  *See e.g., Federal Home Loan Mortgage Corp v. Lamar*, 503 F.3d at 513.

While a majority of Plaintiffs' claims will be dismissed, the lack of an initial validation notice to Mr. Molesky and the question of a bona fide defense, leaves the violation under § 1692g to be determined by the trier of fact.  Therefore, to the extent a violation under the FDCPA remains viable, a claim under the Ohio Consumer Sales Practices Act on this issue also remains viable and also a matter to be determined at trial.  Accordingly, Defendant's motion for summary judgment as to violations under the Ohio Consumer Sales Practices Act is denied on the validation notice to Mr. Molesky and granted in all other respects.

### V. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment (Doc. No. 47) is granted as follows:

Count I as it pertains to Jeffrey Hornyak;

Count II as it pertains to Jeffrey and Paula Hornyak and violations under 15 U.S.C. § 1692e;

Count III as it pertains to the claims of Jeffrey and Paula Hornyak;

Count VI in its entirety; and

Count VII in its entirety.

Defendant's motion for summary judgment (Doc. No. 47) is denied as follows:

Count I as it pertains to Jarred Molesky;

Count II as it pertains to Jarred Molesky; and

Count VII as it pertains to Jarred Molesky.


So Ordered.

s/ Jeffrey J. Helmick
United States District Judge